# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 4, 2023

## ROBERT ALLEN DOLL, III v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Davidson County**
**No. 22-0363-II      Robert E. Lee Davies, Senior Judge**

_____

### No. M2022-01723-SC-R3-BP

_____

In this case, an attorney appeals the recommended sanction of disbarment after three criminal convictions. The attorney was convicted by a jury of two counts of subornation of aggravated perjury and one count of criminal simulation, all Class E felony offenses and serious crimes under Tennessee Supreme Court Rule 9, section 22. All three criminal convictions arose out of the attorney's conduct in representing a client. In the ensuing disciplinary proceedings, a Board of Professional Responsibility hearing panel recommended disbarment. The attorney appealed the hearing panel's decision to the chancery court, which affirmed. The attorney appealed to this Court. On appeal, the attorney argues the hearing panel should have reviewed similar cases of attorney misconduct where a suspension was imposed, and that he should be suspended based on the sanction imposed in those cases. Under Tennessee Supreme Court Rule 9, Board of Professional Responsibility hearing panels and trial courts considering attorney discipline promote consistency in the imposition of sanctions by anchoring their decisions on punishment to the American Bar Association Standards for Imposing Lawyer Sanctions. Rule 9 does not give either hearing panels or trial courts authority in attorney disciplinary cases to base recommended attorney disciplinary sanctions on a review of sanctions imposed in comparative cases. The Supreme Court's more expansive perspective from seeing the broad swath of attorney disciplinary matters in the entirety of the State—whether appealed or not—puts it in the best position to consider comparative cases for the sake of uniformity of punishment throughout Tennessee. In this case, considering the nature of the attorney's misconduct, no comparable case convinces us that suspension, rather than disbarment, is the appropriate sanction. Accordingly, we affirm the judgment of the chancery court and the decision of the hearing panel and impose the sanction of disbarment.

**Tenn. Sup. Ct. R. 9, § 33.1(d); Judgment of the Chancery Court Affirmed.**

HOLLY KIRBY, C.J., delivered the opinion of the court, in which JEFFREY S. BIVINS, ROGER A. PAGE, SARAH K. CAMPBELL, and DWIGHT E. TARWATER, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Robert Allen Doll, III.

James W. Milam, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

## OPINION
### FACTUAL AND PROCEDURAL BACKGROUND

The respondent attorney in this case, Robert Allen Doll, III, has been licensed to practice law in Tennessee since 2003. Pursuant to Tennessee Supreme Court Rule 9, section 33.1(d), he appeals the discipline imposed by a hearing panel of the Tennessee Board of Professional Responsibility ("BPR" or "Board").

On May 17, 2017, Mr. Doll was convicted by a Williamson County jury of two counts of subornation of aggravated perjury, in violation of Tennessee Code Annotated section 39-16-705, and one count of criminal simulation, in violation of Tennessee Code Annotated section 39-14-115(a)(1)(c).[1] *See State v. Robert Allen Doll, III*, No. II-

---

[1] Tennessee Code Annotated section 39-16-705(a) defines "subornation" as: "A person commits an offense who, with the intent to deceive, induces another to make a false statement constituting perjury or aggravated perjury." Tenn. Code Ann. § 39-16-705(a). Addressing aggravated perjury, Tennessee Code Annotated section 39-16-703(a) states: "A person commits [aggravated perjury] who, with intent to deceive: (1) Commits perjury as defined in § 39-16-702; (2) The false statement is made during or in connection with an official proceeding; and (3) The false statement is material." Tenn. Code Ann. § 39-16-703(a). Also addressing aggravated perjury, Tennessee Code Annotated section 39-16-703(b) provides: "[i]t is no defense [to an aggravated perjury charge] that the person mistakenly believed the statement to be immaterial." Tenn. Code Ann. § 39-16-703(b).

On criminal simulation, Tennessee Code Annotated section 39-14-115 provides:

(a)(1) A person commits the offense of criminal simulation who, with intent to defraud or harm another:

    (A) Makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source or authorship that it does not have;

CR078988-B (Williamson Cnty. Tenn. May 17, 2017). The discipline at issue arises out of these criminal convictions, described below.[2]

### *Underlying Criminal Convictions*

Mr. Doll practiced law with an association of attorneys in middle Tennessee. His practice largely consisted of family law. *State v. Doll*, No. M2019-00236-CCA-R3-CD, 2020 WL 7231101, at *5 (Tenn. Crim. App. Dec. 8, 2020), *perm. app. denied*, (Tenn. May 13, 2021). The support staff for the association of attorneys consisted of a person at the front desk, Mr. Tim Carter, who was a notary public. *Id.*

Pamela Denise Van Burkleo hired Mr. Doll in 2010 to represent her in divorce and post-divorce proceedings against her ex-husband, who was in Texas. The criminal convictions underlying the discipline in this case arise from Mr. Doll's representation of Ms. Van Burkleo in the post-divorce proceedings. *Id.* at *1.

By the time the events underlying the criminal convictions arose in 2013, Mr. Doll had been representing Ms. Van Burkleo for several years. In early 2013, Ms. Van Burkleo had concerns about her children visiting with the ex-husband, so she asked Mr. Doll to file an emergency petition to restrict his parenting time. On March 1, 2013, an emergency *ex parte* petition was filed in the Williamson County circuit court on behalf of Ms. Van Burkleo, to prevent her ex-husband from exercising his visitation with their children. *Id.* at *5. Affidavits from each of their two teenage sons were attached to the petition. *Id.* The emergency petition had an oath by Ms. Van Burkleo appended to it, as part of the petition. *Id.* Ms. Van Burkleo's signature on the oath was notarized by Mr. Carter, and Mr. Doll signed the petition as her attorney.[3] *Id.* On the basis of this petition, the first trial

---

> (B) Possesses an object so made or altered, with intent to sell, pass or otherwise utter it; or
>
> (C) Authenticates or certifies an object so made or altered as genuine or as different from what it is.

Tenn. Code Ann. § 39-14-115.

[2] Mr. Doll appealed his criminal convictions to the Tennessee Court of Criminal Appeals. *See State v. Doll*, No. M2019-00236-CCA-R3-CD, 2020 WL 7231101 (Tenn. Crim. App. Dec. 8, 2020), *perm. app. denied*, (Tenn. May 13, 2021). The record for the underlying criminal case is not part of our record in this disciplinary appeal, so the facts of the events that form the basis for the criminal convictions are taken largely from the Court of Criminal Appeals opinion and its recitation of the facts at trial.

[3] Mr. Doll testified to the BPR hearing panel that another attorney in his association of attorneys filed the petition while he was out of town and obtained the *ex parte* temporary restraining order.

judge granted a temporary restraining order enjoining the ex-husband from exercising his parenting time with the children.[4]  *Id.*

Later, on March 26, 2013, a second trial judge, Judge Timothy Easter, conducted a hearing to determine whether the temporary restraining order should be extended.[5]  *Id.*  One of the attorneys in Mr. Doll's association of attorneys appeared at the hearing to represent Ms. Van Burkleo because Mr. Doll was still out of town.  *Id.*  Ms. Van Burkleo testified under oath at this hearing that she had not signed the emergency petition.  *Id.*  Judge Easter then asked Ms. Van Burkleo directly whether she signed the emergency petition in front of a notary public, and she answered that she had not.  *Id.*  Judge Easter declined to extend the temporary restraining order, set another hearing for April 23, 2013, and said he wanted to hear from Mr. Doll on the issue at the hearing.  *Id.*

When Mr. Doll returned from out of town, he learned of the events during his absence.  He filed another petition on behalf of Ms. Van Burkleo, identical to the initial emergency petition, with an oath executed by Ms. Van Burkleo and affidavits executed by her sons.  The Williamson County circuit court, however, never reached the merits of the second petition.

Mr. Doll appeared at the April 23, 2013 hearing as ordered.  *Id.*  He was not under oath, but he assured Judge Easter that Ms. Van Burkleo was in his office the day the emergency petition was signed, and that she had reviewed it.  *Id.*  Mr. Doll professed not to know why Mr. Carter would notarize a signature that was not Ms. Van Burkleo's signature.  *Id.*  Judge Easter told Mr. Doll that he and Mr. Carter were potentially facing criminal charges and advised them to get counsel.  *Id.*  He set another hearing for May 7, 2013.  *Id.* at *6.

Judge Easter asked the District Attorney General for Williamson County to attend the May 7, 2013 hearing.  *Id.*  At the hearing, Mr. Doll appeared but did not testify under oath.  *Id.*  He told Judge Easter that his calendar indicated he prepared the emergency petition for Ms. Van Burkleo on March 1, 2013, some two hours before Ms. Van Burkleo came to his office to review and sign the documents.  *Id.*  At this hearing, one of the other

---

[4] In later proceedings, the first trial judge, who granted the emergency petition, said that if the petition had not included Ms. Van Burkleo's sworn oath, the clerk's office would not have submitted it to him for review.  *Doll*, 2020 WL 7231101, at *5.  He explained that the oath required an affiant like Ms. Van Burkleo to swear to the truth of the facts in the petition, as shown by the notarized signature, in the same way a witness would take an oath to tell the truth before testifying.  *Id.*

[5] There was no court reporter at this hearing.

attorneys in Mr. Doll's office appeared to represent Mr. Carter, and told Judge Easter that Mr. Carter was this attorney's employee. *Id.* Judge Easter set a show cause hearing for June 18, 2013.[6] *Id.*

At the June 18, 2013 hearing, Mr. Carter was represented by a criminal defense attorney. *Id.* Mr. Carter's counsel called Ms. Van Burkleo to testify. *Id.* In her testimony, Ms. Van Burkleo claimed that she had, in fact, signed the oath on the emergency petition. *Id.* She said that, at the prior hearing, her response to questioning by Mr. Van Burkleo and Judge Easter was only that her signature "looked different" on the emergency petition. She insisted that the signature on the petition was in fact hers and that she had signed it in the presence of Mr. Carter. *Id.* Ms. Van Burkleo commented that, from time to time, she would change up her signature. *Id.*

At the same hearing, Mr. Doll asked Ms. Van Burkleo whether she had "come in [his] office . . . with all three children on March the 1st to sign the [emergency] petition," and Ms. Van Burkleo said she did. *Id.* Judge Easter pointed out to Ms. Van Burkleo that her answer was not consistent with her previous testimony under oath. *Id.* Nevertheless, Mr. Doll pressed forward to ask Ms. Van Burkleo if Mr. Carter was present and notarized her signature on March 1, 2013, and Ms. Van Burkleo said yes. *Id.* In light of Ms. Van Burkleo's testimony, Judge Easter said there was no longer an issue about her signature on the emergency petition. *Id.*

On July 13, 2015, the District Attorney General obtained grand jury indictments against Ms. Van Burkleo and Mr. Doll. *Id.* at *1. Counts 1 and 2 alleged that Ms. Van Burkleo committed aggravated perjury when she testified falsely under oath that a notary public witnessed her sign an affidavit in support of her emergency petition for a temporary restraining order against her ex-husband. *Id.* The indictment also alleged that Ms. Van Burkleo testified falsely during the show cause hearing to determine the authenticity of her notarized signature. *Id.* Counts 3 and 4 of the indictment alleged that, on June 18, 2013, Mr. Doll committed subornation of aggravated perjury with regard to the same emergency petition. *Id.* Count 5 alleged that Mr. Doll committed criminal simulation on March 1, 2013 by forging Ms. Van Burkleo's signature on the oath on the petition. *Id.*

Mr. Doll was tried on the criminal charges before a Williamson County jury, and Judge Mark Fishburn presided over the trial. At the trial, the State presented evidence from Ms. Van Burkleo's employer that she was at work on March 1, 2013 at the time the emergency petition was signed and notarized. *Id.* at *6. Mr. Carter testified that he did not

---

[6] The Court of Criminal Appeals's opinion appears to refer to this hearing as a "show cause" hearing, but the reference is not entirely clear. *Doll*, 2020 WL 7231101, at *1.

recall anything about the emergency petition, including whether he notarized the signatures of either Ms. Van Burkleo or Mr. Doll. *Id.*

Ms. Van Burkleo testified that Mr. Doll represented her in post-divorce proceedings in her efforts to change the visitation arrangement with her ex-husband because she was concerned for the physical and mental safety of her children. *Id.* As summarized by the Court of Criminal Appeals, Ms. Van Burkleo testified at trial about the signature on her oath for the emergency petition and why she had given prior inconsistent statements about it:

> She agreed that at the March 26, 2013 hearing, she said that the signature on the petition was not her signature. She said she told Judge Easter that she had no idea who had signed the document.
>
> Ms. Van Burkleo said that, the following day, [Mr. Doll] called her and seemed irritated and said "don't you remember giving me permission to sign your name?" She told him that she did not and further that she did not have an email indicating as much, which was the usual course of her arrangement with [Mr. Doll]. She thought [Mr. Doll] sounded irritated and very short. Ms. Van Burkleo said this was the first she learned that it was [Mr. Doll] who had signed her name.
>
> Ms. Van Burkleo was extremely concerned for her children, so [Mr. Doll] filed a second emergency petition on her behalf. During the course of their discussions, [Mr. Doll] told Ms. Van Burkleo that attorneys sign documents for clients frequently and that he might get a minor reprimand but, since the conten[t]s of the affidavit were true, there would be no harsh punishment. [Mr. Doll] then told her during their phone conversation, "you just say, you know, all those documents that you saw, all your signatures look different, but that they're all yours." [Mr. Doll] also told her that Mr. Carter could get in trouble and lose his job if Ms. Van Burkleo did not say that it was her signature. Ms. Van Burkleo said that, on the day of the hearing, [Mr. Doll] met her outside the courtroom and reminded her that Mr. Carter could lose his job and instructed her how to testify. He never informed her that she could get into trouble for lying under oath. Instead, he gave her the impression that it was fine because the contents of the affidavit were in fact true. She said that she trusted him, and she testified that all of the signatures on the petitions, including the March 1, 2013 petition, belonged to her.

Ms. Van Burkleo said that she never went to [Mr. Doll's] office at all on March 1, 2013. She never signed the affidavit petition in the presence of Mr. Carter. She agreed that she perjured herself when she said otherwise. She had been indicted for two counts of aggravated perjury.

*Id.* at \*6–7.

The State also offered the testimony of a handwriting expert. *Id.* at \*7. The expert testified: "Ms. Van Burkleo's known signature was not similar to the one on the petition." *Id.* The expert also testified that "after examining known signatures of [Mr. Doll], it appeared that it was [Mr. Doll] who signed Ms. Van Burkleo's signature on the petition." *Id.*

Mr. Doll testified at his trial. *Id.* He explained that "he had the petition ready to go and left it for Ms. Van Burkleo to sign. He assumed that she did so. He denied ever asking Ms. Van Burkleo to testify that she had signed the petition or that Mr. Carter had notarized her signature." *Id.* On cross-examination, Mr. Doll acknowledged that "he told Judge Easter at the April 23, 2013, hearing that Ms. Van Burkleo was in his office on March 1, 2013, at 3:00 p.m. to sign the emergency ex parte petition." *Id.* Mr. Doll also acknowledged that "he questioned his own client, Ms. Van Burkleo, about whether she came to his office on March 1, 2013. Her answer resulted in her being charged with aggravated perjury and also being prosecuted civilly for over a million dollars by" her ex-husband. *Id.*

Mr. Doll claimed he was unaware of who actually signed Ms. Van Burkleo's name for the petition, but he conceded that "some of the 'slants' and 'angles' of his own signature mirrored those of the signature purported to be of Ms. Van Burkleo on the petition. He agreed that the signature on the petition did not look like any other that he had seen from Ms. Van Burkleo." *Id.*

On May 17, 2017, at the conclusion of the trial, the jury convicted Mr. Doll of two counts of suborning aggravated perjury and one count of criminal simulation. *Id.* at \*1. The trial court sentenced him to two years of probation. *Id.*

Mr. Doll appealed his convictions to the Tennessee Court of Criminal Appeals.[7] On December 8, 2020, the Court of Criminal Appeals affirmed the convictions. *Id.* Mr. Doll sought permission to appeal his convictions to this Court, which was denied. *Doll*, 2020 WL 7231101 (Tenn. Crim. App. Dec. 8, 2020), *perm. app. denied*, (Tenn. May 13, 2021).

---

[7] Mr. Doll appealed the timeliness of his indictment; he did not contest the sufficiency of the evidence to support his convictions. *Doll*, 2020 WL 7231101, at \*5.

## *Disciplinary Proceedings*

The offenses for which Mr. Doll was convicted are Class E felonies and constitute "serious crimes" under Tennessee Supreme Court Rule 9, section 22.[8] Consequently, after the convictions, BPR Disciplinary Counsel notified the Tennessee Supreme Court of the convictions.[9] On May 31, 2017, this Court suspended Mr. Doll's law license and referred the matter to the Board for formal proceedings "in which the sole issue to be determined shall be the extent of final discipline" to be imposed.[10]

---

[8] Tennessee Supreme Court Rule 9, section 2 defines "serious crime" as:

any felony and any other crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, willful tax evasion, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

Tenn. Sup. Ct. R. 9, § 2.

[9] Tennessee Supreme Court Rule 9, section 22.1 provides:

(a) The clerk of any court in this state in which an attorney enters a plea of nolo contendere or a plea of guilty to, or is found guilty by verdict of the jury or of the trial court sitting without a jury of, a crime shall within ten days of the plea or verdict transmit a copy thereof to the Court and to Disciplinary Counsel.

(b) Any attorney subject to the disciplinary jurisdiction of this Court who has entered a plea of nolo contendere or a plea of guilty to, or who has been found guilty by verdict of the jury or of the trial court sitting without a jury of, any serious crime, as defined in Section 2, shall within ten days of such plea or verdict provide adequate proof of the plea or verdict, including a copy thereof, to Disciplinary Counsel.

(c) Upon receiving notice from an attorney pursuant to Section 22.1(b) with respect to any serious crime, as defined in Section 2, or upon otherwise being advised that an attorney subject to the disciplinary jurisdiction of the Court has entered a plea of nolo contendere or a plea of guilty to, or has been found guilty by verdict of the jury or of the trial court sitting without a jury of, any crime, Disciplinary Counsel shall obtain adequate proof of the plea or verdict, including a copy thereof, and shall file the same with a Notice of Submission in the Nashville office of the Clerk of the Supreme Court.

Tenn. Sup. Ct. R. 9, § 22.1.

[10] Tennessee Supreme Court Rule 9, section 22.3(c) provides:

On June 1, 2017, the Board filed a petition for final discipline against Mr. Doll, and a hearing panel was appointed. Mr. Doll notified the BPR of his intent to appeal the convictions, so resolution of the petition was deferred until the conclusion of Mr. Doll's appeals. *See* Tenn. Sup. Ct. R. 9, § 22.3(c).[11]

Once the appeal of the underlying criminal convictions concluded, the disciplinary proceedings resumed. The hearing panel tried the matter on November 23, 2021.

At the hearing, Mr. Doll was the only person to testify. Mr. Doll admitted to the fact of his felony convictions, and that they all related to his actions as a practicing attorney and occurred while he was representing a client before the court. While Mr. Doll's counsel emphasized that Mr. Doll acknowledged he could not challenge the convictions, he gave context for them. For example, Mr. Doll emphasized that, at the trial on the criminal charges, Ms. Van Burkleo was a cooperating witness with criminal charges against her, and that she testified differently than she had testified at the show cause hearing before Judge Easter. Mr. Doll said that his "recollection is [Ms. Van Burkleo] came in and to my knowledge signed that document." He said he had been paid a flat fee earlier, so he made no money on the emergency petition, and that he had a good attorney-client relationship with Ms. Van Burkleo until she testified against him at his criminal trial. Mr. Doll acknowledged that, as a result of the events, Ms. Van Burkleo was charged with perjury and sued by her former husband.

Before the hearing panel, the Board argued that the presumptive sanction was disbarment under Standard 5.1 of the American Bar Association's Standards for Imposing Lawyer Sanctions ("ABA Standards"), based on the serious nature of the crimes of which Mr. Doll was convicted, and the fact that they involve intentional interference with the administration of justice, dishonesty and deceit, and soliciting another to commit those

---

> (c) Upon the receipt of adequate proof and copies of a judgment, plea of nolo contendere or guilty plea with respect to a serious crime, as defined in Section 2, the Court shall, in addition to suspending the attorney in accordance with the provisions of Section 22.3(a), also refer the matter to the Board for the institution of a formal proceeding before a hearing panel in which the sole issue to be determined is the extent of the final discipline to be imposed, provided that a disciplinary proceeding so instituted will not be brought to hearing until all appeals from the conviction are concluded.

Tenn. Sup. Ct. R. 9, § 22.3(c).

[11] Tennessee Supreme Court Rule 9, section 22.3(c), states that "a disciplinary proceeding so instituted will not be brought to hearing until all appeals from the conviction are concluded." Tenn. Sup. Ct. R. 9, § 22.3(c).

offenses. It emphasized that his actions took place in proceedings before a court and were detrimental to the administration of justice. The Board pointed out Mr. Doll's prior disciplinary history, his substantial experience in the practice of law, his illegal conduct, and the dishonest nature of his offenses as aggravating factors.

Counsel for Mr. Doll did not dispute the presumptive sanction under the ABA Standards but emphasized the hearing panel's discretion in determining the sanction. He contended Mr. Doll had no dishonest or selfish motive, noted he had cooperated with the BPR investigation of the matter, and argued that the prior discipline was remote from the current convictions. Finally, arguing there is "disparity" in lawyer discipline, counsel for Mr. Doll asked the hearing panel to compare a disciplinary case, *In re Grace Ingrid Gardiner*, in which the attorney received a suspension rather than a disbarment for what he characterized as similar misconduct.[12]

The Board objected to this last argument, arguing that recent Tennessee Supreme Court cases had indicated that hearing panels were not to consider comparative cases.

The panel allowed Mr. Doll's attorney to argue the *Gardiner* case and took the matter under advisement.[13]

On December 1, 2021, the hearing panel issued its decision. The panel found the Board had proven by a preponderance of the evidence that Mr. Doll was convicted of three criminal offenses, including two acts of subornation of aggravated perjury and criminal simulation, all of which are felonies and constitute serious crimes.

To determine the sanction, the hearing panel then looked to the ABA Standards. The panel found applicable Standards 5.1 and 5.11,[14] which identify disbarment as the

---

[12] Counsel for Mr. Doll cited *In re Grace Ingrid Gardiner* from the BPR press release as BPR Number 23269, a disciplinary matter that apparently was not appealed.

[13] Counsel for Mr. Doll argued that the misconduct in *Gardiner* was similar to that of Mr. Doll, including presenting to a bankruptcy court a document with a forged signature, but the sanction imposed was three years of suspension, with four months active suspension and the remainder on probation. The Board responded that, if the panel chose to consider comparative cases, *Gardiner* was distinguishable because the attorney in that case was not convicted of a crime.

[14] ABA Standard 5.11 states:

5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing,

presumptive sanction "when a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, and solicitation of another to commit any of these offenses." The hearing panel also found applicable Standards 7.0 and 7.1,[15] because Mr. Doll "violated his duties owed as a professional by knowingly engaging in conduct with the intent to obtain a benefit for the lawyer or another and causing serious or potentially serious injury to a client." These ABA Standards also identify disbarment as the presumptive sanction.

The panel found five aggravating factors. The first was prior discipline; the panel found that the Board had shown Mr. Doll had a September 19, 2011 private informal admonition, an April 14, 2014 public censure, and a September 20, 2018 ninety-day summary suspension. The second aggravating factor was Mr. Doll's dishonest and selfish motives. The third was Mr. Doll's refusal to acknowledge the wrongful nature of misconduct, and the fourth was Mr. Doll's substantial experience in the practice of law. The fifth aggravating factor was Mr. Doll's illegal conduct, consisting of the three felony convictions, including two for subornation of aggravated perjury.

The hearing panel found one mitigating factor, Mr. Doll's cooperative attitude in the disciplinary proceedings.

The hearing panel's decision considered Mr. Doll's argument that disbarment was not proportionate in light of a comparative case, *Gardiner*. The hearing panel distinguished *Gardiner*, noting that the attorney in that case was neither charged nor convicted of a criminal offense. It also acknowledged the Board's argument that the hearing panel was not permitted to consider comparative cases.

---

misrepresentation, fraud, extortion, misappropriation, or theft . . . or solicitation of another to commit any of these offenses

ABA Standard 5.11

[15] ABA Standard 7.1 states:

7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

ABA Standard 7.1.

The hearing panel pointed to Mr. Doll's convictions and said that "conviction of such acts, particularly of acts of subornation of aggravated perjury, cuts through the very heart of the judicial system and cannot be minimized in any way." After cross-motions to alter or amend, the hearing panel entered an order reaffirming its decision to disbar Mr. Doll.[16]

### *Trial Court Review*

Mr. Doll filed a petition for review of the hearing panel's judgment in the Davidson County Chancery Court, pursuant to Tennessee Supreme Court Rule 9, section 33.1(a). In support of his argument that disbarment was a disproportionate sanction, Mr. Doll asked the trial court to consider comparative cases, again citing the *Gardiner* disciplinary decision. The trial court declined to do so. The trial court said it understood the holdings in *Meehan v. Board of Professional Responsibility of Supreme Court of Tennessee*, 584 S.W.3d 403 (Tenn. 2019) and *Beier v. Board of Professional Responsibility of Supreme Court*, 610 S.W.3d 425 (Tenn. 2020), to be that hearing panels and trial courts in attorney disciplinary cases are to rely on the ABA Standards, not sanctions imposed in comparative cases, to choose the appropriate sanction.[17]

On November 8, 2022, the trial court issued its memorandum opinion affirming the judgment of the hearing panel. The trial court agreed that Standard 5.11(a) reflected the appropriate presumptive sanction for Mr. Doll's convictions of subornation of aggravated perjury and criminal simulation, reasoning that "[a]ll three offenses amount to an intentional interference with the administration of justice" and are "explicit violations of [the] duty owed by every attorney." Turning to the aggravating and mitigating factors, the trial court said "there can be no serious challenge to the Panel's conclusion that the

---

[16] The Board filed a motion asking the hearing panel to alter its order to clarify that, in support of its contention that the panel was not to consider comparative cases, the Board had cited *Beier v. Board of Professional Responsibility of Supreme Court*, 610 S.W.3d 425, 436 (Tenn. 2020) (citing *Meehan v. Board of Professional Responsibility of Supreme Court of Tennessee*, 584 S.W.3d 403, 416 (Tenn. 2019)). The Board also contended that the panel improperly addressed Mr. Doll's argument that the punishment of disbarment by considering a comparative case. Mr. Doll filed a response and a petition to rehear arguing that *Beier* and *Meehan* did not prohibit the panel from considering comparative cases in determining the proper discipline.

On January 12, 2022, the hearing panel entered the order reaffirming its earlier decision. The panel distinguished *Beier* because the attorney in that case was not convicted of a crime. In support of its decision to disbar Mr. Doll, the panel cited *Meehan*, in which the attorney was convicted of a serious crime, and this Court affirmed disbarment as the sanction.

[17] The trial judge commented that he had been the trial judge in both *Meehan* and *Beier* and was well familiar with them.

aggravating factors far outweigh the single mitigating factor." It affirmed disbarment as the appropriate sanction for Mr. Doll.

Mr. Doll now appeals to this Court under Tennessee Supreme Court Rule 9, section 33.1(d).

**STANDARD OF REVIEW**

This Court oversees the practice of law in this State in exercise of the authority vested in it by the Tennessee Constitution. *Beier*, 610 S.W.3d at 435–36 (Tenn. 2020) (citing Tenn. Const. art. II, § 1; Tenn. Const. art. II, § 2; Tenn. Const. art. VI, § 1). "Accordingly, when we are called upon to review judgments in disciplinary proceedings against lawyers, we do so in light of our fundamental and inherent power to promulgate, administer, and enforce the rules governing the licensing and professional conduct of lawyers practicing in Tennessee." *Talley v. Bd. of Pro. Resp.*, 358 S.W.3d 185, 190 (Tenn. 2011). When an attorney or the Board seeks judicial review of the hearing panel's decision, the trial court's "review shall be on the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 33.1(b). The trial court may:

> reverse or modify the decision if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b). Subsection (d) addresses appeals to the Tennessee Supreme Court.

> Either party dissatisfied with the decree of the circuit or chancery court may prosecute an appeal directly to the Court. The appeal shall be determined upon the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel, and upon the parties' briefs but without oral argument, unless the Court orders otherwise.

- 13 -

Tenn. Sup. Ct. R. 9, § 33.1(d). In all, this Court "bear[s] ultimate responsibility for enforcing the rules governing our profession. *Beier*, 610 S.W.3d at 437 (quoting *Mabry v. Bd. of Pro. Resp. of Supreme Court*, 458 S.W.3d 900, 903 (Tenn. 2014).

## ANALYSIS

On appeal, Mr. Doll argues that BPR hearing panels have the authority to review comparative discipline, i.e. prior disciplinary cases involving similar circumstances, to determine the proper sanction in a given case. In the alternative, he argues that, under this Court's review, suspension rather than disbarment is the appropriate sanction for Mr. Doll. We consider both issues in turn.

### *Hearing Panel Review*

Mr. Doll argues first that, in deciding the recommended sanction in a disciplinary matter, BPR hearing panels may review comparative discipline, i.e. prior disciplinary decisions involving similar circumstances. Indeed, Mr. Doll asserts that a hearing panel would abuse its discretion by declining to review such comparative discipline.

We respectfully disagree. In attorney disciplinary cases, BPR hearing panels derive their authority from Tennessee Supreme Court Rule 9. *See* Tenn. Sup. Ct. R. 9. Section 15.4 of Rule 9 provides: "In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions." Tenn. Sup. Ct. R. 9, § 15.4(a). Rule 9 does not provide authority for either hearing panels or trial courts to base recommended attorney disciplinary sanctions on a review of sanctions imposed in comparative cases:

> Under Rule 9, a hearing panel is directed to consider the applicable provisions of the ABA Standards to determine the appropriate sanction in a particular case. Tenn. Sup. Ct. R. 9, § 15.4(a). There is no authority under Rule 9 for a hearing panel to base its recommended sanction on a review of sanctions imposed in similar cases. In addition, a trial court's authority to reverse or modify a hearing panel's decision is limited to the five grounds listed in Section 33.1(b). Inconsistency with sanctions in similar cases is not a listed ground.

*Meehan*, 584 S.W.3d at 416. The holding in *Meehan* was emphasized later in *Beier*, in which the Court said that "neither BPR hearing panels nor reviewing trial courts are

- 14 -

authorized to base a recommended sanction on a review of sanctions imposed in comparative cases." 610 S.W.3d at 436–37. The *Beier* Court clarified:

> The chancery court based its conclusion on the appropriate sanction in part on a comparative analysis, that is, a review of similar cases to determine the appropriate sanction. As noted above, this Court recently held that, while hearing panels and trial courts must consider the applicable provisions of the ABA Standards to determine the appropriate sanction in a particular case, "[t]here is no authority under Rule 9 for a hearing panel to base its recommended sanction on a review of sanctions imposed in similar cases." *Meehan*, 584 S.W.3d at 416 (citing Tenn. Sup. Ct. R. 9, § 15.4(a)). Moreover, "a trial court's authority to reverse or modify a hearing panel's decision is limited to the five grounds listed in Section 33.1(b). Inconsistency with sanctions in similar cases is not a listed ground." *Id.* Thus, reviewing trial courts are not authorized to base a recommended sanction on a review of sanctions imposed in comparative cases. Our opinion in *Meehan*, however, was issued after the chancery court's decision in this case, so the chancery court could not have been aware of it when the ruling was made.

*Beier*, 610 S.W.3d at 448 n.23. Thus, this Court stated in both *Meehan* and *Beier* that Rule 9 does not authorize either hearing panels or trial courts to base recommended attorney disciplinary sanctions on a review of sanctions imposed in comparative cases.

Despite the language in Tennessee Supreme Court Rule 9 and the Court's directive in *Meehan* and *Beier*, Mr. Doll urges us to permit hearing panels and trial courts to utilize comparative cases to determine the appropriate sanction in attorney disciplinary cases. Doing so, he argues, would promote uniformity of punishment and align attorney disciplinary proceedings with current practices for mitigating a defendant's sentence in criminal cases.[18]

---

[18] Mr. Doll points to the United States Sentencing Guidelines applicable in federal criminal proceedings, which permit a criminal defendant to cite analogous cases to mitigate his sentence. He argues that disciplinary hearing panel proceedings are similar.

We have repeatedly rejected similar attempts to liken attorney disciplinary proceedings to criminal proceedings. "As this Court has repeatedly held, attorney disciplinary proceedings are not criminal proceedings." *Harris v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 645 S.W.3d 125, 136 (Tenn. 2022) (citing cases).

We decline to do so. The omission in Rule 9 of authority for hearing panels and trial courts to consider comparative cases is intentional, not inadvertent. The Court recently explained the centrality of the ABA Standards to achieving uniformity of punishment in attorney discipline:

> Regardless of comparative cases, . . . the primary tool for determining appropriate and consistent sanctions for attorney misconduct is the ABA Standards. The Standards themselves state their purpose:
>
> > The Standards constitute a model, setting forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct. They are designed to promote: (1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; (3) consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions.
>
> ABA Standard 1.3 ("Purpose of These Standards"). Thus, the ABA Standards were designed to promote consistency in the imposition of disciplinary sanctions. "Use of the ABA Standards will further the goal of our disciplinary system because they 'combine clear, straight-forward guidelines which ensure a level of consistency necessary for fairness to the public and the legal system with the flexibility and creativity essential to secure justice to the disciplined lawyer." *Grievance Adm'r v. Lopatin*, 612 N.W.2d 120, 127 (Mich. 2000) (quoting *In re Buckalew*, 731 P.2d 48, 52 (Alaska 1986)). They serve as a guide to impose "a level of discipline that takes into account the unique circumstances of the individual case, but still falls within broad constraints designed to ensure consistency." *Id.*
>
> Under the ABA Standards, barring unusual circumstances, once the correct presumptive sanction is determined, that sanction generally applies unless aggravating or mitigating factors indicate a greater or lesser sanction is appropriate.

*Manookian v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 685 S.W.3d 744, 808 (Tenn. 2024) (some citations omitted) (cleaned up). Thus, under Rule 9, hearing panels and trial courts

considering attorney discipline promote consistency in the imposition of sanctions by anchoring their decisions on punishment to the ABA Standards.

We recognize that attorney disciplinary matters are fact-intensive, and decisions on the appropriate sanction may hinge on nuance, detail, and unique circumstances in a particular case. *See, e.g.*, *In re Sitton*, 618 S.W.3d 288, 299 (Tenn. 2021) (noting there are "cases where the facts do not fit neatly within the ABA Standards"). For that reason, we have emphasized that the ABA Standards "serve as 'guideposts' for determining the appropriate punishment rather than 'rigid rules that dictate a particular outcome.'" *In re Vogel*, 482 S.W.3d 520, 533 (Tenn. 2016) (quoting *Hyman v. Bd. of Pro. Resp. of Sup. Ct.*, 437 S.W.3d 435, 447 (Tenn. 2014)).

The ABA Standards themselves "allow the application of aggravating or mitigating circumstances to adjust the sanction imposed."[19] *In re Cope*, 549 S.W.3d 71, 75 (Tenn. 2018) (citing ABA Standard 9.1)). The ABA Standards list of aggravating and mitigating factors "are illustrative, not exclusive, and other factors may be considered." *In re Sitton*, 618 S.W.3d at 303 (in addition to listed aggravating and mitigating factors, Court considered as an additional aggravating circumstance that lawyer's unethical comments "were made in a very public setting, on social media").

Courts have recognized that "meaningful comparisons of attorney sanction cases are difficult as the behavior that leads to sanction varies so widely between cases." *In re Robinson*, 209 A.3d 570, 597 (Vt. 2019) (quoting *In re Strouse*, 34 A.3d 329, 340 (Vt. 2011) (Dooley, J., dissenting)). Tethering the disciplinary decisions of hearing panels and trial courts to the ABA Standards is the best way to afford them the flexibility needed to account for the unique circumstances in a given case, while also promoting consistency by ensuring that the level of discipline falls within broad boundaries.

Still, our rules recognize that "[i]nconsistent sanctions, either within a jurisdiction or among jurisdictions, cast doubt on the efficiency and the basic fairness of all disciplinary systems." *Background*, ABA Standards. To minimize the risk of such inconsistency, this Court reviews attorney sanctions imposed across the State, even sanctions that are not appealed. *See, e.g.*, Tenn. Sup. Ct. R. 9, § 15.4(b) (Court review where there is no appeal) ("The Court shall review the recommended punishment provided in such judgment or settlement with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case."); *see also*

---

[19] Aggravating circumstances are defined as "any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Mitigating circumstances are defined as "any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31.

*Manookian*, 685 S.W.3d at 807 (attorney appeal) ("For the sake of uniformity, we seek to review the sanctions imposed in any other cases with similar circumstances.").

Hearing panels and trial courts have ready access to the relatively few reported opinions on disciplinary cases that are appealed, but have limited access to and familiarity with the greater number of disciplinary decisions that are not appealed. Moreover, unappealed disciplinary decisions not reflected in court opinions, such as the *Gardiner* case cited repeatedly by Mr. Doll, may reflect a lesser discipline for reasons that are not apparent from press releases or summaries, such as proof or witness problems after investigation, TLAP referrals, and the like, but which are often revealed to this Court in documents filed to aid our review of the discipline. Thus, the Supreme Court's more expansive perspective from seeing the broad swath of attorney disciplinary matters in the entirety of the State— whether appealed or not— puts it in the best position to appropriately consider comparative cases for the purpose of ensuring uniformity of punishment throughout Tennessee.

For these reasons, we decline Mr. Doll's invitation to interpret Tennessee Supreme Court Rule 9 as authorizing hearing panels and trial courts determining attorney discipline to consider comparative cases in addition to applying the ABA Standards.

## 2. Supreme Court Review

We next review the sanction recommended by the hearing panel and affirmed by the trial court. Here, the hearing panel identified disbarment as the appropriate presumptive sanction under ABA Standards 5.11 and 7.1 and found five aggravating and one mitigating factor applicable. The trial court agreed with this analysis.

We agree that disbarment under ABA Standards 5.11(a) and 7.1 is the appropriate presumptive sanction for Mr. Doll's convictions of subornation of aggravated perjury and criminal simulation. As stated by the trial court, all three criminal convictions "amount to an intentional interference with the administration of justice" and "are explicit violations of dut[ies] owed by every attorney."

The hearing panel identified five aggravating factors: (1) prior discipline; (2) dishonest and selfish motives; (3) refusal to acknowledge the wrongful nature of the misconduct; (4) substantial experience in the practice of law; and (5) the nature of the illegal conduct. It identified one mitigating factor, Mr. Doll's cooperative attitude in the disciplinary proceedings. We agree that all of these factors are applicable, and we agree with the trial court that the five aggravating factors "far outweigh the single mitigating factor." Thus, the hearing panel applied the appropriate ABA Standards and the aggravating and mitigating factors.

- 18 -

Mr. Doll does not dispute these findings. Instead, Mr. Doll notes that the ABA Standards are guidelines, not mandates, and he asks this Court to conduct its own comparative analysis and find suspension, not disbarment, to be the appropriate sanction for Mr. Doll.

In response, the Board argues that this Court should not undertake a review of comparative discipline unless we first determine that the hearing panel chose to apply incorrect ABA Standards. The Board points to Tennessee Supreme Court Rule 9, section 15.4(b), which applies when neither party appeals the sanction. Rule 15.4(b) states that this Court "review[s] the recommended punishment provided in such judgment[s] . . . with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case." Tenn. Sup. Ct. R. 9, § 15.4(b). Because this case was appealed under Section 33, the Board says this Court's review is under the same standard of review as the trial court, citing *Board of Professional Responsibility v. Reguli*, 489 S.W.3d 408, 417 (Tenn. 2015). The Board posits that there "is no basis for the Court to conduct a proportionality review of the sanction in this case, absent an abuse of discretion by the trial court or the hearing panel."

We respectfully disagree. This Court is the "final and ultimate arbiter of the propriety of the professional conduct of all lawyers practicing in Tennessee." *Talley*, 358 S.W.3d at 190. The Court "reviews disciplinary judgments in light of our 'inherent power . . . and fundamental right to prescribe and administer rules pertaining to the licensing and admission of attorneys.'" *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 612 (Tenn. 2010) (quoting *In re Burson*, 909 S.W.2d 768, 773 (Tenn. 1995)). Nothing in our Rules precludes the Court from reviewing comparative cases on appeal.

Moreover, the Board's argument overlooks our precedent. In prior cases in which a party has appealed to this Court, we have said that, "[i]n reviewing the punishment appropriate for an offense, it is also appropriate to consider sanctions imposed in cases with similar facts." *Lockett v. Bd. of Pro. Resp.*, 380 S.W.3d 19, 29 (Tenn. 2012); *see also Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Maddux*, 148 S.W.3d 37, 40 (Tenn. 2004); *Milligan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 166 S.W.3d 665, 673 (Tenn. 2005). This is true even where the hearing panel applied the appropriate ABA Standards and their application of the standards and aggravating and mitigating factors was supported by substantial and material evidence. *See Hanzelik v. Bd. of Pro. Resp. of Sup. Ct.*, 380 S.W.3d 669, 682 (Tenn. 2012); *Bailey v. Bd. of Pro. Resp.*, 441 S.W.3d 223, 236 (Tenn. 2014). In all, we decline to constrain our appellate review in the manner suggested by the Board.

Mr. Doll first asks us to compare his conduct to the attorney in *In re Grace Ingrid Gardiner*, which he obtained from a BPR press release on the attorney's discipline.[20] Both the hearing panel and the trial court were correct in observing that, unlike Mr. Doll, the attorney in *Gardiner* was not convicted of a crime.

Mr. Doll compares his conduct to cases where he says a suspension was imposed even though the attorneys were convicted of felony offenses, citing *Lockett*, 380 S.W.3d 19; *In re Cope*, 549 S.W.3d 71; Order, *In re Ford*, BPR #14312, No. M2016-01035-SC-BAR-BP (Tenn. Dec. 22, 2016); and Order, *In re Temple*, BPR #26096, No. M2015-01280-SC-BAR-BP (Tenn. June 27, 2016).

As noted in *In re Cope*, in cases where an attorney was convicted of a felony, "almost all of the attorneys were disbarred." 549 S.W.3d at 75. In the few cases where the attorney received a suspension instead of disbarment, there were significant differences from the facts in Mr. Doll's case.

First, in those cases, none of the attorneys had three felony convictions. *See In re Cope*, 549 S.W.3d at 72, 76 (one felony conviction for insider trading involving fraud and deceit); Order, *In re Ford*, BPR #14312, No. M2016-01035-SC-BAR-BP (Tenn. Dec. 22, 2016) (theft over $1,000); Order, *In re Temple*, BPR #26096, No. M2015-01280-SC-BAR-BP (Tenn. June 27, 2016) (one attempted criminal usury conviction); *Lockett*, 380 S.W.3d at 22 (state court conviction of felony theft and federal court conviction of willful failure to file tax returns).

Second, in the *Cope* opinion, the Court acknowledged that disbarment was the presumptive sanction, but pointed out that the attorney "had no other disciplinary actions in his career, his criminal conduct was atypical, and his conduct did not injure his clients." *In re Cope*, 549 S.W.3d at 76. The same cannot be said of Mr. Doll. He has had three prior disciplinary actions, and his three felony convictions were directly related to his use of his law license. *See In re Robinson*, 209 A.3d at 597 (noting that prior case law did not support departing from the presumptive sanction of disbarment because in prior cases where criminal conduct resulted in suspension "the criminal conduct was not directly related to the [attorneys'] use of their law licenses.").

---

[20] For the reasons we noted above, cases that are not reflected in an opinion by this Court are less helpful than published opinions in a proportionality review. Press releases and summaries of these cases may not reflect things like proof or witness issues, nuance and detail that can be important in comparing one case to another.

Significantly, Mr. Doll cannot claim that his conduct did not injure his client. The details about Mr. Doll's misconduct and his defense in his disciplinary hearing show why his conduct toward his client was particularly egregious.

Here, the proof in Mr. Doll's criminal case, apparently credited by the jury, showed that Ms. Van Burkleo was at her workplace when the fake signature was placed on the oath for the emergency petition and notarized. The proof indicated that Mr. Doll himself put the signature on the document.

The proof also showed that, after Ms. Van Burkleo testified that she did not sign the petition, at the next hearing, Mr. Doll told Judge Easter "that Ms. Van Burkleo was in his office the day that the petition was signed." *Doll*, 2020 WL 7231101, at *5. At the next hearing, Mr. Doll embellished this untruth and told Judge Easter that his calendar showed he prepared the emergency petition on March 1, 2013, "two hours before Ms. Van Burkleo arrived in his office at 3:00 p.m. to review and sign the documents." *Id.* at *6.

Not content with his own prevarication to hide his misconduct, the proof at the criminal trial showed Mr. Doll proceeded to coach Ms. Van Burkleo into lying in open court. Ms. Van Burkleo testified that Mr. Doll called her and, in an irritated and short manner, said "don't you remember giving me permission to sign your name?" *Id.* She responded that she did not. *Id.* He minimized his misconduct, telling her that "attorneys sign documents for clients frequently and that he might get a minor reprimand but, since the conten[t]s of the affidavit were true, there would be no harsh punishment." *Id.* Mr. Doll went on to instruct her, at the hearing, "you just say, you know, all those documents that you saw, all your signatures look different, but that they're all yours." *Id.* He warned her that, if she did not repeat that lie, Mr. Carter "could get in trouble and lose his job." *Id.*

Ms. Van Burkleo testified at the criminal trial that, the day of the show cause hearing before Judge Easter, Mr. Doll met her outside the courtroom "and reminded her that Mr. Carter could lose his job and instructed her how to testify." *Id.* Mr. Doll never disclosed to Ms. Van Burkleo that he was coaching her to commit a criminal offense; instead he led her to believe "it was fine because the contents of the affidavit were in fact true." *Id.* Ms. Van Burkleo dutifully followed Mr. Doll's instructions, and ended up being charged with criminal offenses for the conduct he urged upon her.

Thus, it is undisputed that the jury in the criminal case credited testimony showing that Mr. Doll took advantage of the trust his client placed in him and pressured her into lying in court, all in order to shield Mr. Doll from the fallout of his actions. This course of action resulted in disastrous consequences for Mr. Doll's client.

The record also supports the hearing panel's finding, as an aggravating factor, that Mr. Doll refused to acknowledge the wrongful nature of his misconduct. True enough, after his conviction for subornation of aggravated perjury, Mr. Doll conceded he could not dispute the underlying criminal convictions and acknowledged they all related to his actions as a practicing attorney. He acknowledged that Ms. Van Burkleo was charged with perjury and sued by her former husband. But instead of recognizing that these consequences were caused by *his* choices and actions, Mr. Doll continued to maintain that Ms. Van Burkleo in fact signed the oath on the emergency petition,[21] and he insinuated that the real problem was Ms. Van Burkleo's choice to testify untruthfully that she did not.[22] He apparently viewed himself as a victim of the contentious nature of post-divorce litigation: "You know, if I could add, domestic attorneys who did this a little longer than me and who are a lot wiser than me advised me don't handle post divorce matters. I wish I'd listened." Mr. Doll's continuing "claim [that] this is all just a gross misunderstanding . . . is not taking responsibility." *In re Sitton*, 618 S.W.3d at 303.

As emphasized by the hearing panel below, Mr. Doll's conduct in this case, particularly his subornation of aggravated perjury, "cuts through the very heart of the judicial system and cannot be minimized in any way." We agree with the hearing panel and the trial court that disbarment, rather than suspension, is the appropriate sanction for Mr. Doll.

For those reasons, we affirm the chancery court's affirmation of the hearing panel's sanction of disbarment, effective upon entry of this Court's order under Tennessee Supreme Court Rule 9, section 28.1.[23]

---

[21] In his testimony, Mr. Doll maintained that his "recollection is [Ms. Van Burkleo] came in and to my knowledge signed that document."

[22] Mr. Doll testified that his relationship with Ms. Van Burkleo was good and "there was really no conflict between the two of us until she testified at trial" that she did not sign the oath on the emergency petition.

[23] At the Board's suggestion, the hearing panel's initial order recommended Mr. Doll be disbarred retroactive to the date of his summary suspension on May 31, 2017. The Board later asked the panel to strike the retroactivity language. The panel's modified order did not modify the retroactivity language. In its brief to this Court, the Board asks us to fix the retroactivity language.

Under Tennessee Supreme Court Rule 9, section 28.1, Mr. Doll's disbarment is effective upon entry of this Court's order. Tenn. Sup. Ct. R. 9, § 28.1. During Mr. Doll's appeals of his criminal conviction, this Court amended Tennessee Supreme Court Rule 9, section 30.2 to provide: "Individuals disbarred under Rule 9 prior to July 1, 2020, may not apply for reinstatement until the expiration of at least five years from the effective date of the disbarment." That order also amended Tennessee Supreme Court Rule 9, section 30.4(d) to state: "Individuals disbarred on or after July 1, 2020, are not eligible for

## CONCLUSION

We hold the trial court's decision upholding the hearing panel's sanction of disbarment was neither arbitrary nor an abuse of discretion. Accordingly, we affirm the judgment of the chancery court and the decision of the hearing panel to disbar Mr. Doll from the practice of law in the State of Tennessee. Mr. Doll's disbarment shall be effective upon entry of this Court's order under Tennessee Supreme Court Rule 9, section 28.1. The costs of this appeal are taxed to Robert Allen Doll, III and his surety, for which execution may issue if necessary.

_____
HOLLY KIRBY, CHIEF JUSTICE

---

reinstatement." Tenn. Sup. Ct. R. 9, § 30.4(d). These amendments took "effect immediately" upon the filing of the January 23, 2020 order.

The petition for discipline against Mr. Doll was filed on June 1, 2017, but because of the intervening criminal proceedings and appeals, the hearing panel decision recommending disbarment was not issued until December 1, 2021. Therefore, Mr. Doll is subject to the July 1, 2020 rule change making disbarment permanent.